Carr, J.
Upon the argument, I was a good deal inclined to think, that these judgements were erroneous; but an attentive and minute examination of the various laws on the subject, for fifty years back, has changed my first impression. Various points of objection, were discussed at the bar: I shall confine myself to that on which the cases were decided by the general court. The clerks of courts were made collectors of the taxes on ordinary licences and various kinds of law process, as early as 1769 (8 Hen. stat. at large, p. 345.) and were to account for them half yearly to the treasurer. That statute, after enumerating taxes to be collected by the sheriffs, inspectors of tobacco, and clerks, enacts, that if such sheriffs, clerks, or inspectors, shall fail to account and pay &c. it shall be lawful for the general court or court of the county where they reside, upon motion and ten days notice, to give judgement against them and their sureties respectively &c. But, at this time, the clerics gave no official bond j the term sureties, therefore, could not apply to them. In 1777 (9 Id. 350. 362.) the clerks were made collectors of the taxes on ordinary and marriage licences &c. and they were to account and pay half yearly; and for failing to account they were to forfeit £ 500. and for failing to pay the money (having accounted) they should be proceeded against as delinquent sheriffs. Then the act subjects delinquent sheriffs to a judgement against them and their sureties fac. Here again we see, that though clerks are subjected in like manner as sheriffs, there could only be a recovery against them individually, for as yet they gave no official bond. In 1784, an act passed changing materially the situation of clerks • *708 II Id. p. 464. The preamble states, that many inconveniences had arisen from their residing out of their counties, and the permission given them by some county courts, to remove the records without the county &c. to correct which ev*Is) ^e statute prescribes the form of the oath, which every clerk thereafter admitted into office should take, and also enacts that every county court clerk shall, on his appointment, give bond and security, in the sum of 3000 dollars, with condition for the due and faithful execution of his office, and that he will not carry the records out of his county, except in cases allowed by law &e. We see here, that no part of the mischiefs to be corrected by this law, was a failure of the clerks to pay up the taxes of which they had been made collectors. Nor does the condition of the bond, nor the words of the oath, point at all towards those taxes. This is pretty strong to shew, that the legislature had not that subject at all in view in passing this law. But there is still stronger evidence, that, instead of looking to this bond, they looked distinctly to another manner of correcting the delinquencies of clerks, as collectors of the revenue. In an act passed at the same session (Id. pp. 378, 9.) the clerks are made collectors of taxes on law process Sic., are allowed five per cent, for collecting, accounting for and paying those taxes into the treasury^ are required to account and pay them twice a year, and on failure, are subjected to the forfeiture of all their commissions, and also to suspension from their office of clerk, until such payment be made. There is another conclusive reason to shew, that the bond of office was not taken as a security against these failures : that bond was not to be given by any clerk then in office, but only by those subsequently appointed; and as they held their offices during good behaviour, such new appointments would only be made (in the general) as the then incumbents should die; so that, for a length of time, a great majority of the clerks would consist of those who had given no bond of office. To this majority, the law could not apply, and to the minority it would not; for we could never suppose, that *709 the legislature meant, that some of the public collectors should be subjected in one way and some in another. I might follow the series down to 1820, and shew that in all the subsequent tax laws, and different editions, the same form of bond and oath has been prescribed for clerks, and the like penalties for failures to pay taxes collected by them ; the laws always looking to different methods, for protection against delinquencies as clerks, and delinquencies as revenue officers. It is a very strong fact too, in proof of the general understanding of these laws, and practice under them, that this is the first attempt ever made, to subject the sureties bound in the official bond of a clerk to a recovery for his failure to account for and pay the taxes collected by him. The act of 1820, shews that the legislative attention was at length called to the danger of suffering clerks to hold so much of the public money, without giving bond and surety for the payment of it; and it then remedied the evil. I am for affirming the judgements.
Brooke, «7. I am of the same opinion.
Tucker, P.
1 am also of opinion, that there is no error in the judgements of the general court overruling the motions of the auditor in these cases: I think the judgements right, and for the reason given by the court.
The bonds on which these motions were made, were not taken under the act of 1820, ch. 4. which requires the clerks of the circuit and inferiour courts to execute bond with surety for the faithful accounting for and payment of the taxes on law process, ordinary licences and other public monies. They are founded on the general official bonds of the clerk. Such bonds were first required of the clerks of the prescribed county courts by the act of 1784, II Hen. stat. at largo, p. 465. and required by all the subsequent statutes, contained in the several revisáis, in relation to the office and duties of clerks. By these acts it is ordained, that every clerk shall enter into bond with *710 condition for the due and faithful execution of his office, and that he will not permit the records to be removed out of the county except in cases allowed by law. And it is contended, that these words embrace every description of official duty; that they comprehend not only such official duties as then existed, but such as might from time to time be superadded; and that the collection and payment of taxes on law process &c. is as much an official duty as any other imposed upon the officer. These positions cannot be denied as general propositions. The terms are certainly broad enough to comprehend the case at bar, unless it can be shewn, by reasonable deduction, that the language, however broad, was not employed in this extended signification. This, I think, may be done.
When a statute of the legislature requires the execution of a bond, and prescribes its terms or its character, the interpretation of the instrument is in fact the interpretation of the statute itself. The party who executes it, cannot deny that it should have the interpretation which the legislature designed: and a fortiori, the sovereign power, who prescribed it, can not fairly extend it to cases which were obviously not intended to be embraced by its provisions. However broad then those provisions, if it shall appear, that the legislature did not intend the bond prescribed, to embrace a particular case, it will be construed not to embrace it: for the true contruction of the statute gives the fair interpretation of the bond. We shall then have occasion to look into our course of legislation, to arrive at just conclusions in this matter. It is not my purpose, however, to go minutely into them, but to refer only to certain general and notorious principles of our legislation, which cannot have escaped the most negligent observer.
The system of requiring security from public collectors, was very early established in the administration of our government. To go no farther back than 1705, we find that sheriffs, in whom was vested the power of collecting the public levies, were also required to give a separate bpnd *711 with surety, for the due performance of that duty. 3 Hen. stat. at large, p. 264. But this prudential measure was not more ancient than the distinction observed, and I think un- . interruptedly adhered to, between what I will call the revenue bond, and the official bond. The sheriff was an officer not less known to the common law, in his connexion with the administration of justice, than the clerk, and not more known, I believe, in the collection of the revenues of the state. This duty was imposed upon him by statute of early date, as the collection of certain taxes has been imposed upon the clerk by some more recent. Moreover, the sheriff, before he had been invested with the powers and duties of a collector, had been required by statute to enter into a general bond like this of the clerk, for the true and faithful performance of his office. 1705, ch. 3. Id. p. 247. Yet at the very same session, when it was declared that the sheriffs should be the collectors of the public levies, it was provided, that he should enter into bond with two sureties, in double the amount of the public and county levies, with condition to collect and pay them Sic. Here then is a clear legislative exposition, more than 125 years ago, that a bond for the true and faithful performance of the sheriff’s office, was not deemed to comprehend the collection and faithful payment of the public taxes, though this duty was imposed on the sheriff ex officio. Whether the words might embrace them or not, the legislature shewed, by a simultaneous act, that they did not use them in any such sense. And as words are but the signs of ideas, and our business is with the ideas and not with the words, it matters not what language is used, if we can only certainly learn in what sense it is used.
The distinction I have adverted to as having been observed between the revenue bond and the official bond given by the sheriff, runs through our subsequent legislation in relation to that officer. See 5 Hen. stat. at large, p. 516. 6 Id. pp. 464.482. 483. 7 Id. pp. 11. 79. 8 Id. p. 39. 9 Id. pp.67.222.357. 10 Id. pp. 167. 253. 506. 11 Id. 93.168. *712 In all these acts, distinct bonds are scrupulously required, with condition to collect and pay over taxes, notwithstanding the official bond, regularly entered into by the sheriff for the faithful performance of his office. At the revisal of 1792, the distinction is broadly marked, by the consolidation and juxtaposition of the various statutory provisions before prevailing in relation to this matter. In the act concerning sheriffs, Rev. Code of 1794, ch. 80. § 8. 9. 10. Pleasants’ edi. p. 121. it is provided, that the sheriff shall give three bonds; one, for duly collecting and accounting for the public taxes; one, for duly collecting all levies, and also all fines &c. due to the commonwealth; and one for collecting and paying officers’ fees, executing and returning process, paying all money received on process, and generally for the faithful performance of his office; and in the act concerning county levies, Id. ch. 134. § 10. p. 252. the county courts are authorized to appoint the sheriff, or any other person, collector; taking a fourth bond for the faithful collection and payment of the county levies: thus clearly evincing, that the official bond was not designed to embrace the collection of taxes and public dues.
Another feature of the system is to be traced in some of these statutes, and is worthy of observation: the provision requiring the official bonds to be recorded in the records of the county, 3 Hen. stat. at large, p. 247, and the revenue bonds to be certified to the auditor of public accounts. The official bonds are not required to be so certified, because the treasury had no concern with them; but the revenue bonds were to be so certified, that the officers of the government might know against whom to move, and be in possession also of the evidence with which to charge them, before the general court.
It is this view of the systematic distinction taken by the legislature, between official and revenue bonds, with which every one at all conversant with public affairs is familiar, that satisfies my mind, that the official bond of the clerk was not designed to cover his collections of taxes. This opi *713 nion is strongly fortified by the first act which required a bond from the clerk. In May 1784, the act passed iraposing taxes on law process, and requiring the clerks to collect them. JYo bond was then required of the clerk, but the payment was injoined under the penalties of loss of commission and suspension from office. In October 1784, bond was first required from the clerks of the county courts; but the preamble shews, that it was not so required with a view to secure accountability for the revenue collected, but to secure the records from removal and destruction, and to ensure the faithful discharge of the ordinary official duties. Moreover, though the sheriff’s bond for revenue, was directed to be certified to the auditor, whose business was with the revenue, this bond was directed to be transmitted to the clerk of the council, merely for safe keeping.
The contemporary exposition of this act, and of the bond to which it gave rise, is irresistibly to be inferred, if (as it was confidently alleged in the argument) this is the first case, in which a motion has been ever attempted to be sustained, upon the ground that the clerk’s official bond embraced the duty of collecting and paying the taxes collected by him. It can scarcely be possible, that no instance of default has ever before occurred. Hence I infer the universal understanding that the bond did not comprehend the case. Accordingly, in 1820, an act, requiring a revenue bond to be given by every clerk, was passed by the legislature. This, though not authoritative, is pregnant evidence of what the law was understood to bo. It is to my mind conclusive evidence of the light in which it was viewed, and always had been viewed, by the intelligent and vigilant officers of the auditor’s department. It is well known, that most of the salutary provisions enacted on the subject of the revenue, have been suggested by them. Their situation brings them acquainted with the defects of the laws, and their sagacity suggests the remedy. Such was, probably, the case in relation to the act of 1820 : the auditor found the former law defective, aud suggested an effectual remedy *714 to the proper authority. This is much better than straining to extend the operation of a statute beyond its obvious design.
. ju(jgements affirmed.